```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
FRANCES GARCIA, pro se,                          :
                                                 :
                        Plaintiff,               :
                                                 :           **MEMORANDUM AND ORDER**
            -against-                            :                 12-CV-4965 (DLI)
                                                 :
CAROLYN W. COLVIN,                               :
Commissioner of Social Security,                 :
                                                 :
                        Defendant.               :
----------------------------------------------------------------x
```
**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Frances Garcia protectively filed an application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act") on November 30, 2008, alleging a disability that began on November 7, 2008. On January 6, 2011, an Administrative Law Judge ("ALJ") found Plaintiff was not disabled through the date of the decision. Plaintiff filed the instant appeal, *pro se*, seeking judicial review of the denial of benefits, pursuant to 42 U.S.C. § 1383(c)(3).[1] The Commissioner now moves for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), seeking affirmance of the denial of benefits. (*See* Mem. of Law in Support of Government's Motion for Judgment on the Pleadings ("Gov't Mem."), Dkt. Entry No. 14.) Plaintiff opposes the motion. (*See* Plaintiff's Affidavit/Affirmation in Opposition to Defendant's Motion ("Pl. Opp."), Dkt. Entry No. 15.)

For the reasons set forth below, the Commissioner's motion is denied. The instant action is remanded to the Commissioner for further proceedings consistent with this decision.

---

[1] *Pro se* pleadings are held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (citation omitted). Courts should "interpret [such papers] to raise the strongest arguments that they suggest." *Forsyth v. Fed'n Emp't & Guidance Serv.*, 409 F. 3d 565, 569 (2d Cir. 2005) (citation and quotation marks omitted). Though a court need not act as an advocate for *pro se* litigants, in such cases there is a "greater burden and a correlative greater responsibility upon the district court to insure that constitutional deprivations are redressed and that justice is done." *Davis v. Kelly*, 160 F. 3d 917, 922 (2d Cir. 1998) (citation omitted).

## BACKGROUND

A.  **Administrative and Procedural History**

On November 30, 2008, Plaintiff protectively filed an application for SSI, which was denied on initial review and reconsideration. (*See* Certified Administrative Record ("R.") 18, Dkt. Entry No. 17.) On December 14, 2010, Plaintiff appeared with counsel and testified at a hearing before an ALJ. (R. 18.) A vocational expert ("VE") testified as well. (*Id.*) On January 6, 2011, the ALJ issued a decision finding that Plaintiff was not disabled and denying her request for benefits. (R. 18-26.) In reaching this conclusion, the ALJ found that: (1) Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1;" (2) Plaintiff has the "residual functional capacity to perform light work" with some limitations; and (3) there are jobs that she could perform. (R. 21-25.) On August 8, 2012, this decision became the final decision of the Commissioner as the Appeals Council denied Plaintiff's request for review. (R. 1.) Subsequently, Plaintiff commenced this appeal seeking to vacate the Commissioner's decision, requesting that the Court award benefits or in the alternative, remand the action for further administrative proceedings. (*See* Complaint ("Compl."), Dkt. Entry No. 1.)

B.  **Non-medical and Testimonial Evidence**

Plaintiff was born in 1970, has a ninth grade education, and speaks some English. (R. 45, 59.) Previously, she worked as a caregiver, a babysitter, and a lunchroom aide. (R. 45.)

At the hearing that was held via video conference, Plaintiff showed her hands to the ALJ because they were then bleeding and broken. (R. 45-46.) She explained that she had dealt with the outbreaks on her hands for 15 years and that she had to stop working in the lunchroom because her hands were "breaking up and bleeding." (R. 46.)

She also described the pain in her left shoulder and her inability to reach. (*Id.*) She stated she could only sit for 30 minutes at a time and was limited to standing and walking for one hour. (R. 47-48.) Plaintiff lives with her husband and four children. (R. 46-47.) She testified that she sometimes cannot cook or bathe her daughter or herself because soap causes her pain in her hands, even if she wears gloves. (R. 50, 51.)

She takes Tylenol for pain, (R. 48), as well as Lisinopril, Januvia, Metformin, Glyburide, Actos, and Vytorin for diabetes, high blood pressure, and cholesterol, (R. 51-52, 220). She has also been prescribed Zoloft, Trazodone, and Ambien due to anxiety and depression. (R. 53-54.) The medications for her depression and anxiety have made her feel better. (R. 55.) Plaintiff also applies a lotion for her hands and testified that the lotion is not working. (R. 56.) She does not suffer from any side effects as a result of the medications she takes. (R. 52.)

She noted for the ALJ that she has been seeing a psychiatrist for one month and that she has crying spells once or twice a week. (R. 49.)

**C.    Medical Evidence**

    **1.    Evidence of Treatment Prior to November 30, 2008**

Plaintiff indicated she was first treated by St. Joseph Family Practice in 2004. (R. 184.) Her physical therapy records from the Reading Hospital indicate that her left arm problem began in October 2007 without aggravating incident. (R. 268.) She had described the pain in her arm as a nine out of ten at worst, with an average of five out of ten. (*Id.*) She also had pain in her neck. (*Id.*) She had limited range of motion and function, was unable to dress herself without pain, and could not use a hair dryer. (*Id.*) Facility records from August 5, 2008 indicate that Plaintiff had returned to physical therapy after an extended absence.[2] (R. 267.) Those records

---

[2] It appears that Plaintiff did not attend physical therapy during July 2008, as the records show appointments in June and an appointment in August. (*See* R. 273.)

also note that Plaintiff has a constant pain in her left shoulder ranging from three to nine on a scale of ten, as well as intermittent mild pain in her right arm. (*Id.*) The pain disrupts her sleep and when her activity increases, her pain increases. (*Id.*)

On January 17, 2007, May 25, 2007, and October 29, 2007, Plaintiff visited her family doctor, Dr. Michael Bradley, for routine appointments. During these visits, Dr. Bradley noted Plaintiff's noncompliance with treatment. (R. 288, 295, 296.) He indicated Plaintiff's diabetes was grossly out of control; she was hyperlipidemic and showed evidence of microalbuminuria, diabetic nephropathy. (*Id.*)

On January 15, 2008,[3] Plaintiff went to the Reading Hospital and Medical Center emergency department with complaints of pain in her left shoulder and arm. (R. 243.) The pain had been occurring for the past two weeks. (R. 244.) The attending physician noted localized edema and tenderness proximal to the lateral upper arm and diagnosed deltoid bursitis. (*Id.*) The doctor prescribed Depo Medrol and suggested that Plaintiff follow up with physical therapy. (*Id.*) While at the emergency department, Plaintiff described her pain as continuous and rated the pain as a six on a scale of one to ten. (R. 253.)

On March 26, 2008, Plaintiff again was seen at the Reading Hospital and Medical Center's emergency department for left shoulder pain. (R. 239.) She was diagnosed with supraspinatus tendinitis. (R. 241.) The attending physician noted that she had no parathesias, weakness, or neck pain. (*Id.*)

On April 22, 2008, Plaintiff visited Dr. Bradley for a routine appointment. (R. 285.) The doctor described Plaintiff's test results as "improving," but noted that there was still evidence of

---

[3] The Record also contains medical records for an emergency department visit on December 23, 2007. (R. 255-64.) However, the chief complaint was nausea, vomiting, and diarrhea, which are not alleged to be ongoing or part of her disability.

4

microalbuminuria and an "A1c of 8.7" that was uncontrolled. (*Id.*) Her blood pressure was "well controlled." (*Id.*)

On September 4, 2008, Plaintiff visited Dr. Bradley for a routine appointment. (R. 283.) Her last visit with him had been five months prior. (*Id.*) Dr. Bradley described her hands as dry and cracking, so he prescribed a cream and directed her to the dermatology department. (*Id.*) He noted previous treatments for her hands had been unsuccessful. (*Id.*) Plaintiff had recently lost 19 pounds, so her diabetes was "doing fairly well." (*Id.*) The doctor provided a prescription for physical therapy for her shoulder bursitis. (*Id.*) Dr. Bradley also noted a history of noncompliance with treatment. (R. 284.)

On October 8, 2008, Plaintiff went to a dermatology clinic because of the rash on her hands that caused itching, pain, and stiffness. (R. 281.) Previous treatments had not worked and she had been experiencing the problem for 14 years. (*Id.*) She stated that she used gloves while cooking and cleaning but that it hurt to touch or grab anything, so she had been unable to work. (*Id.*) The record indicates that the dermatologist observed erythema and flaky skin on Plaintiff's fingers, diagnosed hand dermatitis, and prescribed another cream treatment. (*Id.*)

On November 5, 2008, Plaintiff visited Dr. Bradley for a routine appointment. (R. 279.) At this time, she had had intermittent improvement with intermittent worsening with the prescribed steroid therapy for her bilateral hand dermatitis eczema. (*Id.*) She had gained some weight but was continuing to watch her weight as part of her diabetes control. (*Id.*) She was also diagnosed with left shoulder bursitis and right shoulder pain, and was sent to additional physical therapy. (*Id.*) He ran laboratory analyses for her diabetes mellitus and hyperlipidemia. (R. 280.)

## 2. Evidence of Treatment After Protective Filing Date of November 30, 2008

Plaintiff saw Dr. Bradley on March 6, 2009. (R. 277.) He noted her complaints of left shoulder pain and her perception that physical therapy had not been successful. (*Id.*) He noted the cracking of her skin on both hands and that a prescription cream of Ultravate had successfully treated her hands in the past. (*Id.*) During this appointment, Plaintiff's blood pressure and sugars were elevated, however, she had not been taking her medication for several days. (*Id.*) Dr. Bradley adjusted her medications to the maximum dosages and noted that her hypertension was uncontrolled, likely due to noncompliance with taking her medications. (R. 278.)

On March 23, 2009, Plaintiff received an MRI of her left shoulder. The MRI impression was tendinitis supraspinatious tendon. (R. 298.) There was an indication of early hypertrophic degenerative changes of the acromioclavicular joint. (*Id.*) There was no evidence of joint effusion or bursitis or a rotator cuff tear. (*Id.*)

A consulting examiner, Dr. Leon H. Venier, met with Plaintiff on May 8, 2009. (R. 305.) Dr. Venier diagnosed capsulitis of both shoulders, diabetes, and eczema. (R. 307.) He noted that her pain ranged from a six to a nine out of ten and that she had difficulty sleeping. (R. 305.) He recorded her limited range of motion and decreased grip strength in both hands. (R. 307.) He opined that Plaintiff could stand or walk for six or more hours per day and sit for eight hours a day with alternating sit/stand at her option. (R. 310.) He claimed her ability for lifting, carrying, and pushing and pulling was limited to ten pounds occasionally. (*Id.*) He remarked that her ability to reach was affected by her impairments and that she was affected by poor ventilation, heights, moving machinery, vibration, wetness, dust, and noise. (R. 313.)

In June, July, and August of 2009, Plaintiff attended physical therapy for her left shoulder. (R. 384.) On June 26, 2009, the rehabilitation update form indicated that Plaintiff's severe pain limits therapy and that, even after only four visits, Plaintiff did not think it was beneficial. (R. 388.) On August 18, 2009, the rehabilitation update form noted that Plaintiff was unable to tolerate even the most minimal palpation let alone aggressive stretching, and that her pain seems out of proportion to diagnostic findings. (R. 387.) The physical therapist recommended discontinuing physical therapy. (*Id.*)

On July 24, 2009, Plaintiff had an initial assessment at Progressions Group. (R. 337.) Her chief complaint was depression that began in February 2009. (*Id.*) Plaintiff expressed concern over her anxiety and fear of being alone. (*Id.*) The records indicate that she was having hallucinations that there was a presence next to her, like a black shadow. (R. 354.) Plaintiff reported crying spells twice a week, irritability, and low motivation. (*Id.*) She also reported a fear of dying and episodes of panic attacks where her hands would sweat and she would become very nervous. (R. 355.) The initial assessment indicates that Plaintiff has some obsessions that require her to check things like the stove and make sure that everything is in its proper place. (R. 356.) The assessor recommended outpatient care. (R. 357.) On August 28, 2009, Plaintiff was given a provisional diagnosis of major depression with a prior GAF of 55 and a current GAF of 50. (R. 361.) Plaintiff saw Dr. Bolmann July 2, 2010, July 30, 2010, and August 27, 2010 and he indicated that her current diagnosis was unchanged. (R. 377-79.)

D.  **Testimony from Vocational Expert**

Mitchell Schmidt, a VE, attended Plaintiff's December 14, 2010 hearing. (R. 58-62.) He testified that Plaintiff's past work as a (i) companion was light, semi-skilled work; (ii) babysitter was medium, semi-skilled work; and (iii) lunch aide was light, unskilled work. (R. 58.) When

7

presented with a hypothetical claimant of Plaintiff's age, education, language abilities, and vocational experience, with a Residual Functional Capacity ("RFC") for light work, but with certain additional limitations, the VE testified that such an individual could perform work as a housekeeping cleaner, a garment sorter, or a folder. (R. 59-60.) However, when questioned specifically about some of Plaintiff's additional complaints such as an inability to use gloves, forgetfulness, her skin condition, diabetes, and depression, the VE stated, "no, I don't think she'll be able to perform competitive employment." (R. 60-61.)

## DISCUSSION

### A.   Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court, reviewing the final determination of the Commissioner, must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F. 3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal quotations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F. 3d 72, 82 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999).

**B.    Disability Claims**

To receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a), (d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 416.920. If at any step, the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to conduct basic work activities." 20 C.F.R. § 416.920(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in Appendix 1.[4] *See* 20 C.F.R. § 404.1520(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's "residual functional capacity" ("RFC") in steps four and five. 20 C.F.R. § 416.920(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 416.920(e). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education, and work experience. If so, the claimant is not disabled. 20 C.F.R. § 416.920(f). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F. 2d at 642).

**C.    ALJ's Decision**

On January 6, 2011, the ALJ issued an unfavorable decision. (R. 18-26.) At the first step, the ALJ found that Plaintiff had not worked since November 30, 2008, the protective filing date. (R. 20.) At the second step, the ALJ concluded that Plaintiff suffered from the following

---

[4]    20 C.F.R. pt. 404, subpt. P, app. 1.

severe impairments: eczema, type 2 diabetes mellitus, adhesive capsulitis of the shoulders, and obesity. (*Id.*) At the third step, the ALJ concluded that these impairments in combination or individually did not meet or equal a listed impairment. (R. 21.) At the fourth step, the ALJ concluded that Plaintiff has the RFC to perform light work, "except that she should only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but should avoid climbing ropes, ladders, and scaffolds, overhead reaching, repetitive reaching, handling, and fingering, and hazards, such as moving machinery and heights." (R. 21-22.) Additionally at step four, he noted "[s]he should be able to work with gloves on but not work around open food products." (R. 22.) The ALJ further concluded that Plaintiff was unable to perform any past relevant work and did not list any transferrable job skills. (R. 24.) Based on Plaintiff's age, education, work experience, and RFC, the ALJ concluded that Plaintiff could work as housekeeper, a garment sorter, or a garment folder and, therefore, found her to be not disabled. (R. 25.)

**D.     Analysis**

    **1.     New Evidence Submitted to the District Court**

"The district court 'may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'" *Williams v. Comm'r of Soc. Sec.*, 236 Fed. App'x 641, 644 (2d Cir. 2007) (quoting 42 U.S.C. § 405(g)). New evidence is material if it is (1) relevant to the Plaintiff's condition during the adjudicated time period, (2) probative, and (3) reasonable that the new evidence would influence the Commissioner's decision regarding the Plaintiff's application. *Williams*, 236 Fed. App'x at 644 (quoting *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004)).

Plaintiff has appealed the ALJ's decision "because of [her] health" and submitted new letters and treatment notes. (Pl. Opp. 5-11.) Some of the new evidence pre-dates the ALJ's decision. (Pl. Opp. 6.) This new evidence, a document titled, "Health Sustaining Medication Assessment Form," clearly relates to the period addressed in the ALJ's decision as it is dated November 23, 2010. (*Id.*) This form lists Plaintiff's diagnoses as non-insulin dependent diabetes, hypertension, hyperlipidemia, and depression, as well as the prescribed medication and the risks to Plaintiff if she does not take the medications. (*Id.*) However, the record reviewed by the ALJ contained all of this information and it is not reasonable to believe that this new information would have impacted the ALJ's decision because it did not address any functional limitations caused by the medications or the underlying conditions.

While some of the new evidence can be considered cumulative and therefore unlikely to influence the Commissioner's decision regarding disability, Plaintiff also submitted new evidence that post-dates the ALJ's decision. (*See* Pl. Opp. 5, 9-11.) This evidence could not have been submitted at the time of the previous proceedings, because it did not exist, therefore, there was "good cause" for the failure to submit the evidence to the ALJ. *See Pollard*, 377 F.3D at 193 (finding "[b]ecause the new evidence submitted . . . did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new' and that 'good cause' existed for her failure to submit this evidence to the ALJ"). However, it is not clear whether these newly submitted documents are relevant to the time period for which Plaintiff was adjudicated not disabled. While the documents are dated after the ALJ's decision, they are consistent with her earlier psychiatric treatment notes (i.e. diagnosing her with Major Depressive Disorder and noting her hallucinations) and refer to "continuing symptoms." (*Cf.* Pl. Opp. 5 *and* R. 337, 354.) This new evidence reasonably would impact the Commissioner's decision regarding Plaintiff's

application since the ALJ specifically excluded Plaintiff's diagnosis of depression as a severe impairment because "the claimant has not alleged symptoms resulting from her mood that would prevent her from working on a sustained basis" and emphasized that the "record contains no other assessments." (R. 20.) This new evidence addresses the Plaintiff's ability to work in light of her psychological diagnoses providing, "Frances's continuing symptoms make her ineligible for work because: she would be unable to follow through on tasks, she would shut down from a high stress environment and would be distracted by the unpredictable presence of her hallucinations." (Pl. Opp. 5.) Similarly, on a newly submitted form, her doctor states that Plaintiff is "unable to work for at least 12 months" due to "chronic depression." (Pl. Opp. 10.)

The VE was presented with a hypothetical that included some of Plaintiff's limitations based on depression and testified "[s]o no, I don't think that she'll be able to perform competitive employment." (R. 60-61.) However, the ALJ ultimately did not utilize the RFC presented by the hypothetical because he did not find all of the limitations credible. (R. 21-24.) Thus, it is reasonable to assume that a more developed record, based on the newly submitted evidence that could address the Plaintiff's condition during the relevant time period, would affect the Commissioner's decision.

The government asserts that since depression was a diagnosed condition that the ALJ was aware of and the evidence post-dates the decision, the new evidence does not warrant a remand. (Def.'s Reply Mem. of Law in Further Support of Def.'s Mot. for Judgment on the Pleadings 3-4, Dkt. Entry No. 16.) However, the government does not address the concern that the new evidence may relate to the relevant time period. Additionally, as noted above, the ALJ specifically relied on the lack of assessments in discounting the effects of the symptoms of Plaintiff's depression diagnosis. As the Second Circuit in *Pollard* explained, "[a]lthough the

new evidence consists of documents generated after the ALJ rendered his decision, this does not necessarily mean that it had no bearing on the Commissioner's evaluation . . . ." 377 F.3d at 193. Just as in *Pollard*, the new evidence does not explicitly refer to the relevant time period but may support Plaintiff's earlier contentions regarding the severity of her conditions.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion is denied. Pursuant to the sixth sentence of 42 U.S.C. § 405(g), the decision of the Commissioner is reversed and this matter is remanded to the Commissioner for consideration of new psychiatric evidence in conjunction with the administrative record, and for further administrative proceedings before an ALJ, including a reassessment of Plaintiff's residual functional capacity by a vocational expert and further development of the record as necessary.

SO ORDERED

DATED: Brooklyn, New York
     March 27, 2014

                _____/s/_____
                DORA L. IRIZARRY
                United States District Judge